**Samuel ALBERT, Plaintiff–Appellant,**

v.

**Salmen LOKSEN, Brooklyn Hospital and Karen Buono, Defendants–Appellees.**

No. 99–7520.

United States Court of Appeals, Second Circuit.

Argued Feb. 2, 2000.

Decided Feb. 02, 2001.

Richard A. Levin, Proskauer Rose LLP, New York, NY, for Defendants–Appellees.

Michael P. Barnes, Law Offices of Michael P. Barnes, New York, NY, for Plaintiff–Appellant.

Before OAKES, CABRANES and SACK, Circuit Judges.

SACK, Circuit Judge:

Plaintiff–Appellant, Samuel Albert, a physicist formerly employed at Brooklyn Hospital (the "Hospital"), brought an action in the United States District Court for the Eastern District of New York alleging that the Hospital fired him in breach of his

contract; that Salmen Loksen, his former supervisor, and Karen Buono, the chief administrator of the Hospital's radiology department, defamed him in the course of his discharge; that Loksen and Buono tortiously interfered with his employment relationship with the Hospital; and that the Hospital was liable for the defamatory statements of its employees. The district court (Raymond J. Dearie, *Judge*) granted summary judgment in favor of the defendants on all claims. We affirm the summary judgment as to Brooklyn Hospital and Buono, but reverse and remand with respect to the defamation and tortious interference claims against Loksen.

## BACKGROUND

### *Albert's Role at the Hospital*

Albert began work as an "assistant physicist" in the Hospital's radiology department in 1994. Loksen, one of the defendants, was his supervisor.

Albert did not have a written employment contract with the Hospital. Shortly after he was hired, however, he attended an orientation session at which Hospital policies were reviewed. Excerpts from the Hospital's "Policy and Procedure Manual" were distributed to those attending. Albert claims he was told throughout the hiring process that the Policy and Procedure Manual governed the terms and conditions of his employment and that it barred the Hospital from terminating him for reporting potentially dangerous conditions. He also asserts that he was told at the orientation session that no reprisals were ever taken against people who reported safety violations.

One of Albert's duties as an assistant physicist was to prepare a device called a "Fletcher Suit applicator" for use in brachytherapy treatment for cervical cancer. The applicator is a tube containing radioactive sources which is inserted into a patient's uterus during the brachytherapy procedure. The sources are sealed cylinders containing pellets of radioactive cesium 137 that have been loaded into the applicator by a physicist. In preparation for treating a patient, the radiation oncologist performing the procedure requests that a physicist prepare the applicator using sources of a specified strength, or level of radioactivity.

The parties dispute the appropriate procedure to be followed when a physician specifies a source of a particular strength that is unavailable at the Hospital. The controversy stems in part from the fact that there are two ways to indicate the strength of a source. A source's strength at the time it is fabricated is its "nominal value." Because of radioactive decay, its strength decreases over time. A source's decayed strength at a particular time post-fabrication is its "actual value."

Loksen asserts that doctors at the Hospital ordered sources using their nominal values, fully aware that such values were ordinarily greater than the actual values of the Hospital's stock, and that when a doctor requested a source of a particular nominal value, he or she wanted that source to be used irrespective of its actual strength. He testified that accordingly, he instructed Albert to have a physician change his or her orders in writing before Albert substituted sources of a different nominal value from those the physician had initially requested.

Albert insists to the contrary that Loksen had given him standing instructions to load the applicator with sources of the closest actual values to the nominal values requested by the doctor. He asserts that after an applicator containing loaded sources is inserted into a patient's body, a computer-generated radiation distribution map guides the supervising physicist in determining how long the applicator should be left there. Albert maintains that after loading an applicator he would ordinarily report the actual values of the sources he had used to Loksen, who would then calculate the appropriate exposure time. By adjusting the exposure time, Albert says, the resulting dose of radiation

would be brought in line with the doctor's original prescription, even though the sources being used had an actual value different from the nominal value requested by the doctor. Albert suggests that because of this procedure, a variation in source strength between the nominal value specified by the doctor and the actual value supplied by Albert would not harm the patient or compromise the treatment.

### The January 30 Incident

On January 30, 1995, while Albert was loading cesium sources stored in the Hospital's radioactive materials room into an applicator to be used by Dr. Nina Dlugy, a radiation oncologist, two of the sources fell to the floor. Albert was unable to find them. Because no sources of equal strength were available, he loaded the applicator with replacement sources that were weaker than those that had been misplaced.

The parties dispute when and to whom Albert first reported this incident. Albert claims he told Dlugy about the replacement sources as soon as he delivered the applicator to her. He asserts that at that time, Dlugy did not ask, and he did not tell her, about the radioactivity levels of the substituted sources. He further claims that he checked the delivery cart with a Geiger counter, in her presence, to make certain that the missing sources were not on the cart. Another employee, Lilya Fridman, said she overheard Albert tell Dlugy he had dropped the sources and saw him check the cart with the Geiger counter. She also stated that Dlugy was calm and did not ask Albert any questions about the dropped sources or their replacements. Dlugy testified that she does not remember any such conversation.

Loksen and Dlugy maintain that Albert did not inform Dlugy about the replacement sources when he delivered the applicator. Loksen was away from the Hospital at the time of the incident. When he returned later that afternoon, about an hour and a half after the two sources had been dropped, Albert told Loksen what had happened. According to Loksen and Dlugy, it was only then that Albert sought out Dlugy and told her about the substituted sources.

According to Loksen, after Albert provided Dlugy with the details of the source substitution, he returned to Loksen's office. The two then found the missing sources in the radioactive materials room using a Geiger counter. Albert alleges that he was unable to retrieve the sources earlier because Loksen had taken the particular Geiger counter necessary to find them with him when he left the Hospital.[1]

With the original sources recovered, Dlugy decided to remove the applicator from the patient and have the sources changed. Albert assisted her with this procedure. The parties agree that the patient was not injured or endangered by the use of the replacement sources or the subsequent exchange of sources.

Albert asserts that he was upset about what he perceived to be the consistently defective equipment that had caused the dropping of the sources in the first place. He claims that he told Loksen that he intended to inform the Hospital and the appropriate regulatory agencies of both the deficiency of the Hospital's equipment and Loksen's frequent absences from the Hospital. According to Albert, Loksen replied that if Albert made any such report he would be fired. Albert also claims to have mentioned to Loksen his concerns about the applicator several times in the weeks before the incident, including when Loksen first gave him the brachytherapy assignment for January 30. Dlugy also acknowledges having told Loksen before

---

1. Albert asserts that the Geiger counter that he used to check the ·delivery cart for the missing sources was a "digital" counter, which is used to measure the strength of radiation fields and which could not have been used to locate them in the radioactive materials room. That task, he testified during his deposition, required the sort of audible "pinging" Geiger counter that Loksen had taken with him out of the hospital.

January 30 that the applicator had a defective part.

The day after the incident, Loksen met with Buono, the chief administrator of the radiology department, and told her his version of the event. Buono discussed the situation with others at the Hospital, including Dlugy and Dr. Huh, the senior physician in the radiology department. Buono testified that she decided, in accordance with Hospital policy, that Albert should be summarily discharged because of his behavior during the incident. She therefore completed a "Termination Report" to submit to the Hospital's director of labor relations. The report was, according to Buono, a "collaborative effort" by Loksen and her. It stated that on January 30, Albert had endangered the welfare of a patient; endangered the safety of co-workers through unnecessary radiation exposure; failed to follow the order of a physician and physicist; was dishonest to a physician and a physicist; and neglected established radiation safety procedure.

*Albert's Termination*

On February 2, Brooklyn Hospital fired Albert for the reasons stated in the report. Albert was notified of his dismissal that day at a meeting also attended by Buono and Loksen. Albert asserts that Buono told him the basis for his discharge was a statement by Loksen that Albert had deliberately attempted to harm a patient. Albert also claims that one Ms. Norris, the director of labor relations, also told him that Loksen had accused him of deliberately endangering a patient. According to Albert, the purpose of these statements by Loksen and Buono about Albert was to neutralize Albert's threat to report Loksen's absences from the department, his use of Hospital equipment to perform outside work during working hours, and the Hospital's inappropriate tolerance of defective equipment. Albert alleges that Loksen's charges have destroyed his professional reputation and left him incapable of obtaining other employment in his field,

although it is not clear from the fragmentary record on appeal whether or to what extent Loksen's alleged statements about Albert were disseminated outside the Hospital.

*Procedural History*

Albert brought this diversity action in the Eastern District of New York in 1996, alleging breach of contract, defamation, and tortious interference with contractual relations. The defendants moved to dismiss all the claims pursuant to Fed. R.Civ.P. 12(b)(6). Judge John R. Bartels denied the motion and discovery followed. Upon its conclusion, the defendants moved for summary judgment before Judge Raymond J. Dearie.[2] The district court granted the motion. The court found that Albert was an at-will employee with no contractual right of employment; that Loksen's statements at issue were subject to a qualified privilege that Albert had failed to overcome; and that Loksen and Buono could not have tortiously interfered with Albert's contractual relations with the Hospital, if any existed, because as Hospital employees they were not third parties to the contract that created those relations, a prerequisite for establishment of the tort.

This appeal followed.

## DISCUSSION

### I. Standard of Review and Choice of Law

We review the district court's grant of summary judgment de novo, construing the evidence in the light most favorable to the non-moving party. *See Tenenbaum v. Williams,* 193 F.3d 581, 593 (2d Cir.1999), cert. denied, 529 U.S. 1098, 120 S.Ct. 1832, 146 L.Ed.2d 776 (2000). Summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law," Fed.R.Civ.P. 56(c), i.e., "[w]here the record taken as a whole could not lead a rational trier of fact

---

**2.** Judge Bartels had passed away in the inter- im.

to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). An issue of fact is "material" for these purposes if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

■ Although Albert is a New Jersey resident, New York State was the situs of his employment with the Hospital, the events around which the suit revolves occurred in New York, the defendants are New York citizens, New York is the forum state, and the parties proceeded in the district court and before us under the tacit agreement that New York law applies. We see no reason for us not to apply the law of New York. *Cf. Celle v. Filipino Reporter Enterprises Inc.,* 209 F.3d 163, 175 (2d Cir.2000) ("No reason of policy warrants a departure from [the parties'] implied choice-of-law" during jury trial); *Merrill Lynch Interfunding, Inc. v. Argenti,* 155 F.3d 113, 121 n. 5 (2d Cir.1998) ("Jurisdiction in this case is premised on diversity, and the parties both present arguments based on New York law, the law of the forum state. It is therefore appropriate for this Court to apply New York law.").

## II. Breach of Contract

Albert alleges that his discharge breached an implied contract of employment between him and the Hospital. He had no written employment agreement with the Hospital, but he claims that oral assurances made to him regarding the Hospital's employment practices limited the Hospital's right to discharge him. He further argues that the Hospital had a contractual and regulatory obligation to pro-

tect employees who reported hazardous work conditions from retaliation.

■ New York has a well-established at-will employment doctrine: "[A]bsent an agreement establishing a fixed duration, an employment relationship is presumed to be a hiring at will, terminable at any time by either party." *Sabetay v. Sterling Drug, Inc.,* 69 N.Y.2d 329, 333, 506 N.E.2d 919, 920, 514 N.Y.S.2d 209, 211 (1987). Albert concedes that he did not have an employment contract of fixed duration. In order to rebut the presumption of at-will employment, then, he was required to produce "evidence that [he] was made aware of a written policy expressly limiting [the employer's] right of termination and that [he] detrimentally relied on that policy in accepting the employment." *Fitzgerald v. Martin-Marietta,* 256 A.D.2d 959, 960, 681 N.Y.S.2d 895, 896 (3d Dep't 1998).

Albert has not produced any express, written limitations on the Hospital's rights to discharge its employees. Although he asserts that he relied upon assurances contained in the Hospital's Policy and Procedure Manual, he has produced nothing from the manual that would limit the Hospital's right to discharge him.[3]

■ Albert claims to have relied upon oral assurances made by a Hospital representative during an orientation session and on "postings and literature indicating an obligation to seek out and come forward with safety violations." Accepting this claim as true, as we must at the summary judgment stage, it does not alter his at-will employment status. "[O]ral assurances . . . cannot of themselves give rise to a triable question of fact" as to the existence of a contractual relationship. *Fitzgerald,* 256 A.D.2d at 960, 681 N.Y.S.2d at 897. In any event, oral assurances that employees would only be fired for serious misconduct and "postings and literature" advising employees to report health and safety haz-

---

**3.** Albert now argues that he was not allowed to see the complete manual during discovery. That is something he should have pursued in the district court during the course of discovery, not here.

ards are the kind of "generalized language" that under New York law "will not give rise to an implied employment contract." *Id.*, 256 A.D.2d at 960, 681 N.Y.S.2d at 896–97. In the absence of evidence that Albert had a contractual relationship with the Hospital, his breach of contract claim fails as a matter of law.

■ Albert also directs us to Title IV, Article 175 of the New York City Health Code,[4] which prohibits retaliatory action against employees who report radiation safety violations. This issue was insufficiently pursued below to require us to hear it on appeal. *See Gurary v. Winehouse*, 190 F.3d 37, 44 (2d Cir.1999) ("Having failed to make the present argument to the district court, plaintiff will not be heard to advance it here"). Albert claims that the issue was preserved by his reference in an affidavit to "all applicable federal, state and local regulation re the handling of radioactive materials," which marks the only even oblique reference to the Health Code in the record. But nowhere in the affidavit, the complaint, or any other document in the record on appeal does Albert cite specifically to Article 175 or claim that it or any other statutory provision created a contract of employment that limited the Hospital's right to terminate him.

Albert has failed to demonstrate a genuine issue of material fact as to the existence of an obligation, contractual or otherwise, that the Hospital breached by discharging him. Summary judgment was therefore properly granted to the Hospital on this cause of action.

## III. Defamation

Albert alleges that Loksen willfully and maliciously made false and defamatory statements to others at the Hospital about his conduct on January 30.[5] These defamatory statements, Albert argues, resulted in his discharge.

### A. Libel or Slander?

■ "Defamation, consisting of the twin torts of libel and slander, is the invasion of the interest in a reputation and good name." *Hogan v. Herald Co.*, 84 A.D.2d 470, 474, 446 N.Y.S.2d 836, 839 (4th Dep't), *aff'd on op. below*, 58 N.Y.2d 630, 444 N.E.2d 1002, 458 N.Y.S.2d 538 (1982). Generally, spoken defamatory words are slander; written defamatory words are libel. *See, e.g, Matherson v. Marchello*, 100 A.D.2d 233, 239, 473 N.Y.S.2d 998, 1003 (2d Dep't 1984); *see also Celle*, 209 F.3d at 176 ("Libel is a method of defamation expressed in writing or print."). Albert's defamation claim is explicitly directed at words spoken by Loksen, not their subsequent reduction to writing in the Termination Report. It is therefore a claim for slander.

### B. Elements of Slander

■ The elements of a cause of action for slander under New York law are (i) a defamatory[6] statement of fact, (ii)

4. Section 175.04(g) reads:

> (1) Any worker ... who believes that a violation of this Code ... exists or has occurred ... with regard to radiological working conditions in which the worker is engaged, may request an inspection by giving notice of the alleged violation to the Bureau of Radiological Health. Any such notice shall be in writing, shall set forth the specific grounds for the notice, and shall be signed by the worker....
> (2) If, upon receipt of such notice, the Bureau of Radiological Health determines that the complaint meets the requirements set forth in § 175.04(g)(1) and that there are reasonable grounds to believe that the alleged violation exists or has occurred, an inspection shall be made as soon as practicable....
> (3) No licensee ... or registrant shall discharge or in any manner discriminate against any worker because such worker has filed any complaint or instituted or caused to be instituted any proceeding under this Code....
> 24 RCNY Hlth.Code Tit. IV, Art. 175, § 175.04.

5. Albert does not argue on appeal that he was defamed by Buono or by the Hospital as the employer of Buono, Loksen or any other employee.

6. Modern courts in New York still use variations on arcane definitions of "defamatory":

that is false, (iii) published to a third party, (iv) "of and concerning" the plaintiff,[7] (v) made with the applicable level of fault on the part of the speaker, (vi) either causing special harm or constituting slander per se, and (vii) not protected by privilege. *See, e.g., Dillon v. City of New York,* 261 A.D.2d 34, 37–38, 704 N.Y.S.2d 1, 5 (1st Dep't 1999) (citing Restatement (Second) of Torts § 558 (1976));[8] *see also Celle,* 209 F.3d at 176 (setting forth the similar elements of a cause of action for libel under New York law). We conclude that there are triable issues of fact that precluded summary judgment on the slander cause of action against Loksen.

Despite the fact that neither the parties nor the district court addressed all of the elements of a cause of action for slander, we discuss each of them. Although we conclude that the plaintiff has raised a triable issue of fact as to each element and, therefore, cannot affirm the district court's grant of summary judgment, *see Name. Space, Inc. v. Network Solutions, Inc.,* 202 F.3d 573, 584 (2d Cir.2000) ("We may, of course, affirm on any basis for which there is a record sufficient to permit conclusions of law, including grounds upon which the district court did not rely."), we discuss each element in order to give some measure of guidance to the district court in conducting further proceedings on remand,

*see, e.g., Sound Aircraft Servs. v. Town of E. Hampton,* 192 F.3d 329, 334 (2d Cir. 1999) (commenting on the proceedings to be undertaken on remand "for the guidance of the district court"); *Rivera v. Senkowski,* 62 F.3d 80, 86 (2d Cir.1995) (offering district court guidance with respect to applicability of a Second Circuit decision on remand).

■■■■■■ *1. Defamatory Statements of Fact.* The record on appeal is unclear as to just what Loksen said to whom. Evidence that Loksen actually made two of the assertedly defamatory statements attributed to him by Albert is clearly hearsay. Albert claims that Buono told him that the reason for his discharge was that "Loksen told her … [he] had deliberately attempted to harm a patient," and that Norris told him Loksen had said Albert had "deliberately endangered a patient." Nothing else in the record on appeal supports the assertion that Loksen in fact made these statements. "When challenged on a motion for summary judgment, a plaintiff may not rely solely on hearsay or conclusory allegations that the slanderous statement was made." *Snyder v. Sony Music Entm't, Inc.,* 252 A.D.2d 294, 298, 684 N.Y.S.2d 235, 238 (1st Dep't 1999) (citing *Schwartz v. Society of the New York Hosp.,* 232 A.D.2d 212, 213, 647

---

that which "exposes an individual 'to public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation, or disgrace, or … induces an evil opinion of one in the minds of right-thinking persons, and … deprives one of … confidence and friendly intercourse in society.'" *Celle,* 209 F.3d at 177 (quoting *Kimmerle v. New York Evening Journal,* 262 N.Y. 99, 102, 186 N.E. 217, 218 (1933) (ellipses in *Celle* )); *cf. Dillon v. City of New York,* 261 A.D.2d 34, 37–38, 704 N.Y.S.2d 1, 5 (1st Dep't 1999) (that "which tends to 'expose the plaintiff to public contempt, ridicule, aversion or disgrace, or induce an evil opinion of him in the minds of right-thinking persons, and to deprive him of their friendly intercourse in society'"") (quoting, *inter alia, Sydney v. MacFadden Newspaper Pub. Corp.,* 242 N.Y. 208, 211–12, 151 N.E. 209, 210 (1926))). *See*

*also Triggs v. Sun Printing & Publishing Ass'n,* 179 N.Y. 144, 153, 71 N.E. 739, 742 (1904) (collecting cases); *Riggs v. Denniston,* 3 Johns. Cas. 198, 205–06, note b (N.Y.Sup.Ct. 1802) (collecting cases).

7. There is no doubt, and the defendants do not suggest otherwise, that the alleged Loksen statements of which Albert complains are "of and concerning" Albert. The issue is therefore not addressed further in this opinion.

8. Although *Dillon* omits mention of the "of and concerning" element of the tort reflected in the Restatement, that requirement logically must be and plainly is recognized by New York law. *See Aronson v. Wiersma,* 65 N.Y.2d 592, 594, 483 N.E.2d 1138, 1140, 493 N.Y.S.2d 1006, 1008 (1985),.

N.Y.S.2d 776, 778 (1st Dep't 1996)); *see also* Fed.R.Civ.P. 56(e) (affidavits in opposition to summary judgment motion "shall set forth such facts as would be admissible in evidence"); *Sarno v. Douglas Elliman–Gibbons & Ives, Inc.*, 183 F.3d 155, 160 (2d Cir.1999) (holding that hearsay statement "did not constitute competent evidence" and thus could not be considered in opposition to motion for summary judgment); *Courtney v. Canyon Television & Appliance Rental, Inc.*, 899 F.2d 845, 851 (9th Cir.1990) (affirming summary judgment against defamation claim where only evidence that defamatory statements were in fact made was inadmissible hearsay); *Barber v. Daly*, 185 A.D.2d 567, 569–70, 586 N.Y.S.2d 398, 400 (3d Dep't 1992) (holding that plaintiff's hearsay assertion that slanderous statements were published did not raise a triable issue of fact). Those alleged statements cannot, therefore, serve as the basis for Albert's defamation claim.

■ There is, however, sufficient non-hearsay evidence in the record from which a jury could properly conclude that Loksen made other defamatory statements about Albert. Loksen testified that in meetings with others, he called Albert "dishonest" with respect to the January 30 incident. He also testified that he told Buono that Albert had "compromised the welfare of a patient." Those statements, in context, essentially accused Albert of (1) failing to notify Dlugy about the change in the sources, (2) leaving the misplaced sources for them to be stumbled upon by co-workers, and (3) then trying to cover up his misbehavior with lies.

Moreover, the Termination Report accused Albert of "[f]ailure to follow the order of a physician and physicist," "[e]ndanger[ing] the safety of co-workers," and "neglect for established radiation safety procedures." Buono testified that the report was a "collaborative effort" between her and Loksen. A reasonable juror could conclude from this concededly sparse evidence that Loksen orally made those statements reflected in the Termination Report, or words to that effect, to Buono.

In deciding whether the jury should be allowed to pass upon statements alleged to be defamatory, the court need only determine that the contested statements "are reasonably susceptible of defamatory connotation." If any defamatory construction is possible, it is a question of fact for the jury whether the statements were understood as defamatory.

*Purgess v. Sharrock*, 33 F.3d 134, 140 (2d Cir.1994) (citations omitted); *see also Weiner v. Doubleday & Co.*, 74 N.Y.2d 586, 592, 549 N.E.2d 453, 455, 550 N.Y.S.2d 251, 253 (1989) ("Whether the contested statements are reasonably susceptible of a defamatory connotation is in the first instance a legal determination for the court"), *cert. denied*, 495 U.S. 930, 110 S.Ct. 2168, 109 L.Ed.2d 498 (1990). The question for the district court thus became whether these words, if spoken by Loksen, were capable of a defamatory meaning.

■ Accusing a hospital worker such as Albert of compromising the welfare of patients by substituting radioactive sources without telling the doctor who was administrating them to a patient about it, being dishonest with respect to a specific set of statements that he made in an effort to cover up his safety violations, disobeying orders from his superiors with respect to safety, and ignoring established safety procedures may "induce an evil opinion of him in the minds of right-thinking persons," *Dillon*, 261 A.D.2d at 38, 704 N.Y.S.2d at 5 (internal quotation marks omitted), and are therefore capable of a defamatory meaning.[9]

---

9. Under New York's "single instance rule," the wrongful assertion that a person erred in a single instance does not lower that person in the estimation of others as a matter of law and the assertion is therefore not defamatory. *See, Celle*, 209 F.3d at 180; *Twiggar v. Ossining Printing & Pub. Co.*, 161 A.D. 718, 719–20, 146 N.Y.S. 529, 530 (2d Dep't 1914). That

We pause for a word of caution. No workplace, we think, can operate effectively unless the employers and employees who work there have the ability to speak freely in evaluating the actions of their employees and co-employees. Freedom from fear of litigation is of particular importance when, as in the case before us, personal safety is at stake. It would be tragic if silence induced by the inhibiting effect of defamation lawsuits resulted in the loss of life, limb or the good health of doctors, medical staff or their patients.

Statements very much like those Loksen is alleged to have made, that a co-employee's work is dangerous and his employment should therefore be terminated, if articulated as an evaluation of his performance, would likely be protected as a statement of opinion. Had Loksen referred to something that Albert in fact had done as "compromising the welfare of patients," or contrary to safety procedures, or even dishonest, see *Edwards v. National Audubon Soc'y*, 556 F.2d 113, 121 (2d Cir.1977), the statement might very well have been incapable of supporting an action for slander.

But *Loksen* did more. If Albert's assertions are true, Loksen in effect accused Albert of failing to inform Dr. Dlugy of the change in strength of the radioactive sources she was administering to a patient. Loksen in effect accused Albert of leaving misplaced sources in a way that endangered co-workers. Loksen in effect accused Albert of then lying about what he did in an attempt to cover it up. Those accusations are more than statements of opinion about Albert's work performance; they are specific statements of fact—statements capable of objective proof-about what Albert did and did not do. And the statements were all made in the context of Loksen's seeking the summary termination of Albert, which virtually eliminates the possibility that they were meant as rhetorical hyperbole. The statements thus heavily laden with assertions of fact were capable of a defamatory meaning sufficient to sustain a defamation recovery.

 *2. Falsity.* A rational juror could conclude that the statements Albert complains of were untrue.[10] Albert, Dlugy, and a radiation oncologist who gave deposition testimony as an expert witness all said that Albert had not endangered

---

rule, however, is a narrow one. See *Armstrong v. Simon & Schuster, Inc.*, 85 N.Y.2d 373, 379 n. 5, 649 N.E.2d 825, 828 n. 5, 625 N.Y.S.2d 477, 480 n. 5 (1995); *see also Handelman v. Hustler Magazine, Inc.*, 469 F.Supp. 1048, 1052 (S.D.N.Y.1978) ("single instance" rule did not bar recovery where article tended to show that plaintiff, an attorney, "acted in total disregard of professional ethics"); *Mason v. Sullivan*, 26 A.D.2d 115, 117, 271 N.Y.S.2d 314, 316 (1st Dep't 1966) (rule does not apply "where the deviation from professional conduct shows a lack of character or a total disregard of professional ethics"). We decline to address the issue, however, in light of the parties' failure to raise it here or in the district court. *See Gurary*, 190 F.3d at 44 (2d Cir.1999).

**10.** For constitutional reasons, see *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986), a private-figure plaintiff such as Albert generally has the burden of proving falsity, at least where the allegedly defamatory statements concern a matter of public interest, *see*

*Flamm v. Am. Ass'n of Univ. Women*, 201 F.3d 144, 148–49 (2d Cir.2000); *Fairley v. Peekskill Star Corp.*, 83 A.D.2d 294, 297, 445 N.Y.S.2d 156, 158 (2d Dep't 1981). There is some authority for the proposition that the general rule at common law, that falsity is presumed and that defendants must bear the burden of pleading and proving truth, survives in defamation suits by private-figure plaintiffs concerning statements on purely private matters. *See Eckhaus v. Alfa–Laval, Inc.*, 764 F.Supp. 34, 37 n. 4 (S.D.N.Y.1991); *King v. Tanner*, 142 Misc.2d 1004, 1010, 539 N.Y.S.2d 617, 622 (N.Y.Sup.Ct.1989). Even if Loksen's allegedly defamatory statements were about a matter of private concern, a question we discuss below, that would not affect who bears the burden of showing truth or falsity in this case, because even if the burden is initially on the defendant, it shifts to the plaintiff in cases such as this where the statements are protected by a qualified privilege. *See Stukuls v. State*, 42 N.Y.2d 272, 279, 366 N.E.2d 829, 833–34, 397 N.Y.S.2d 740, 745 (1977).

the patient or his co-workers. There is also a genuine dispute as to whether, as Loksen assertedly said, Albert violated standing department policy by using replacement sources with the closest available actual value to the nominal value of the sources that were missing. Albert claims, moreover, that he locked the door to the room containing the dropped sources and posted a "do not enter" sign, thereby precluding the possibility that any of his co-workers could have been unnecessarily exposed to radiation. And Fridman's testimony that Albert told Dlugy about the dropped sources upon delivery casts further doubt upon the notion that Albert endangered the patient and co-workers by not revealing to Dlugy what had happened. If a jury believes Albert's account of events, it thus could conclude that the statements by Loksen about the January 30 incident to Buono and others were also false.

■ *3. Publication.* Under New York defamation law, "publication is a term of art.... A defamatory writing is not published if it is read by no one but the one defamed. Published it is, however, as soon as read by any one else." *Ostrowe v. Lee,* 256 N.Y. 36, 38, 175 N.E. 505 (1931) (Cardozo, C.J.). In New York, this rule applies even to statements made by one employee to another. Other jurisdictions have held that communications made by one employee of a corporation to another have not been published within the law of defamation's meaning of the term. *See Bals v. Verduzco,* 600 N.E.2d 1353, 1354 n. 1 (Ind.1992) (collecting cases). New York, however, does not adhere to that view. *See Pirre v. Printing Developments, Inc.,* 468 F.Supp. 1028, 1041 (S.D.N.Y.) (citing, *inter alia, Kennedy v. James Butler, Inc.,* 245 N.Y. 204, 156 N.E. 666 (1927); Restatement (Second) of Torts § 577, cmt. (i) (1977)), *aff'd without opinion,* 614 F.2d 1290 (2d Cir.1979); *Loughry*

*v. Lincoln First Bank, N.A.,* 67 N.Y.2d 369, 377, 502 N.Y.S.2d 965, 969, 494 N.E.2d 70 (1986).

■ *4. Fault.* The New York Court of Appeals has held that "where the content of [an] article is arguably within the sphere of legitimate public concern, which is reasonably related to matters warranting public exposition, the party defamed may recover" if he or she can establish "by a preponderance of the evidence, that the publisher acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties." *Chapadeau v. Utica Observer–Dispatch, Inc.,* 38 N.Y.2d 196, 199, 341 N.E.2d 569, 571, 379 N.Y.S.2d 61, 64 (1975). We recently noted that while *Chapadeau* itself was about the liability of a media defendant for statements contained in a published article, the standard also governs suits by private plaintiffs such as Albert against non-media defendants such as Loksen if the allegedly defamatory statements were "arguably within the sphere of public concern" and admit of measurement by the *Chapadeau* standard, at least when they are publicly made. *See Konikoff v. Prudential Ins. Co. of Am.,* 234 F.3d 92, 101–02 & n. 8 (2d Cir.2000), (collecting cases).

Whether the subject matter of Loksen's statements was arguably a matter of legitimate public interest is by no means clear. In light of the extremely broad interpretation of that standard by New York courts, decisions in which *Chapadeau* was held inapplicable because the subject matter was not a matter of legitimate public concern are extremely rare. *See Krauss v. Globe Int'l, Inc.,* 251 A.D.2d 191, 193–94, 674 N.Y.S.2d 662, 664–65 (1st Dep't 1998) (liaison between ex-husband of television personality and prostitute prior to divorce was not arguably of legitimate public concern);[11] *cf. Weldy v. Piedmont Airlines,*

---

**11.** The continued viability of *Krauss*'s holding that such matters are not of public concern is in doubt in light of *Huggins v. Moore,* 94

N.Y.2d 296, 303–05, 726 N.E.2d 456, 461–62, 704 N.Y.S.2d 904, 909–10 (1999), in which the New York Court of Appeals held that

*Inc.*, 985 F.2d 57, 64 (2d Cir.1993) (implying that *Chapadeau* does not apply to suit by private plaintiff suing for defamation in course of discharge from private employment). It is therefore difficult to infer from the case law a standard by which to distinguish between private statements that are and are not arguably of legitimate public concern.

The safety of patients undergoing radiation treatment at a public hospital may arguably be a matter of legitimate public concern. *Cf. Konikoff*, 234 F.3d at 102 (validity of appraisals of property owned by real-estate funds arguably within the sphere of public concern); *Mott v. Anheuser-Busch, Inc.*, 910 F.Supp. 868, 874 (N.D.N.Y.1995) (issues involving alleged water pollution by defendant arguably within the sphere of public concern), *aff'd mem.*, 112 F.3d 504 (2d Cir.1996); *Post v. Regan*, 677 F.Supp. 203, 209 (S.D.N.Y.) (unauthorized transactions conducted by the defendant insurance brokerage arguably within the sphere of public concern), *aff'd mem.*, 854 F.2d 1315 (2d Cir.1988), *cert. denied*, 488 U.S. 1043, 109 S.Ct. 870, 102 L.Ed.2d 993 (1989); *Luisi v. JWT Group, Inc.*, N.Y.L.J., Sept. 18, 1987, at 7, col.3, 14 Media L. Rep. (BNA) 1732 (N.Y.Sup.Ct.1987) (allegedly improper accounting practices by defendant's employee arguably within the sphere of public concern), *aff'd w/o opinion*, 138 A.D.2d 987, 525 N.Y.S.2d 454 (1st Dep't), *appeal denied*, 72 N.Y.2d 803, 528 N.E.2d 520, 532 N.Y.S.2d 368 (1988).

On the other hand, the New York Court of Appeals has said that "publications directed only to a limited, private audience are 'matters of purely private concern.'" *Huggins v. Moore*, 94 N.Y.2d 296, 303, 726 N.E.2d 456, 460, 704 N.Y.S.2d 904, 908 (1999) (citing, *inter alia, Dun & Brad-*

*street, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 759, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985)); *see also Mott*, 910 F.Supp. at 874 ("'A public controversy is a dispute that in fact has received public attention because its ramifications will be felt by persons who are not direct participants.'" (quoting *Fairley v. Peekskill Star Corp.*, 83 A.D.2d 294, 298, 445 N.Y.S.2d 156, 159 (2d Dep't 1981))). Loksen's statements were directed only to Buono and others on the hospital staff. They concerned a single instance of misconduct affecting a single patient. As such, they may plausibly be found to have been about a purely private matter outside the scope of the *Chapadeau* standard. *Cf. Weldy*, 985 F.2d at 64 (holding that the discharge of an employee by a private airline was not a matter of public concern); *Yesner v. Spinner*, 765 F.Supp. 48, 52–53 (E.D.N.Y. 1991) (holding that statements in letter to state agency accusing court reporter of "modifying transcripts" were "a matter of purely private and not public concern," and thus that the plaintiff may recover "presumed damages" without a showing of "actual malice") (citing *Dun & Bradstreet*).

What is the applicable standard of fault if the statements were not covered by *Chapadeau*? The New York Court of Appeals has not addressed the issue. At least one intermediate appellate court has held that a plaintiff in such circumstances "need show only that [the] defendant [was] negligent in publishing the [statement]." *Krauss*, 251 A.D.2d at 194, 674 N.Y.S.2d at 665 (citing *Gaeta v. New York News Inc.*, 95 A.D.2d 315, 466 N.Y.S.2d 321 (1st Dep't 1983), *rev'd on other grounds*, 62 N.Y.2d 340, 465 N.E.2d 802, 477 N.Y.S.2d 82 (1984)).[12]

---

alleged "economic spousal abuse" by the husband of a popular stage actress and singer was a matter of public concern, at least when it was treated by a media defendant as an example of broader social issue.

**12.** The court in *Krauss* applied a negligence standard with little discussion, citing only the

Appellate Division, First Department's decision in *Gaeta*. That decision offers no discussion and cites no authority in applying a negligence standard. *Gaeta*, 95 A.D.2d at 319, 327, 466 N.Y.S.2d at 324, 328. The same is true of the trial court decision affirmed by the Appellate Division in *Gaeta*, which noted that

The parties did not argue the appropriate level of fault either before the district court or on this appeal. The district court did not address the issue, granting summary judgment to Loksen on the ground of qualified privilege instead. "The matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals." *Singleton v. Wulff*, 428 U.S. 106, 121, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976). In light of the sparsity of the record on Loksen's level of care in gathering and disseminating the information contained in the statements he allegedly made, the likelihood that a fuller record will enable a sounder determination of whether the contents of the statements were "arguably within the sphere of legitimate public concern," and the absence of argument by the parties or a decision by the district court on this issue, we decline to decide whether Loksen's statements are covered by the *Chapadeau* standard and, if not, whether negligence or some other level of fault is applicable. We leave those issues for decision by the district court in the first instance on remand.

 *5. Special harm or actionability per se.* To establish a cause of action in slander, the plaintiff must show either that the statement complained of caused him or her "special harm" or that it constituted slander "per se." *See Dillon,* 261 A.D.2d at 38, 704 N.Y.S.2d at 5. Generally speaking, "special harm" means " 'the loss of something having economic or pecuniary value.' " *Liberman v. Gelstein,* 80 N.Y.2d 429, 434–35, 605 N.E.2d 344, 347, 590 N.Y.S.2d 857, 860 (1992) (quoting Restatement (Second) of Torts § 575, cmt. b (1976)). The four categories of statements that have historically constituted slander per se in New York are those that (i) charge the plaintiff with a serious crime; (ii) tend to injure the plaintiff in his or her trade, business or profession; (iii) imply that the plaintiff has a loathsome disease; or (iv) impute unchastity to a woman. *See Liberman,* 80 N.Y.2d at 435, 605 N.E.2d at 347, 590 N.Y.S.2d at 860. The issue of whether a statement is actionable per se is for the court. *James v. Gannett Co.,* 40 N.Y.2d 415, 419, 353 N.E.2d 834, 837, 386 N.Y.S.2d 871, 874 (1976).

 There is no proof of "special harm" incurred by Albert in the record on appeal. But we conclude that as a matter of law, the assertions allegedly made by Loksen about Albert, a hospital physicist, that, *inter alia,* he handled radioactive material in a manner that "compromised the welfare of a patient and[,] if [it] ... continued, ... definitely could have resulted in improper treatment and endangered the patient's life," he "endangered the safety of co-workers," and he "had neglect for established radiation safety procedures" would obviously tend to injure him in his profession. The statement, if false and defamatory, is therefore actionable per se. Pleading and proof of special harm is unnecessary.[13]

New York courts had yet to determine the applicable level of fault in such situations, but concluded, again without discussion or authority, that "negligence principles are applicable." *Gaeta v. New York News, Inc.,* 115 Misc.2d 483, 485, 454 N.Y.S.2d 179, 181 (1982). In light of this rather attenuated string of authority, we are somewhat reluctant to view *Krauss* as binding on this issue.

**13.** There are threads of case law in New York holding or suggesting that entirely apart from the requirement that a plaintiff prove special (pecuniary) damages in some defamation cases, such a plaintiff must *always* establish that his or her reputation incurred some injury as a result of the defamatory communication in order to prevail. *Compare Silberman v. Georges,* 91 A.D.2d 520, 456 N.Y.S.2d 395 (1st Dep't 1982), *France v. St. Clare's Hosp. & Health Ctr.,* 82 A.D.2d 1, 441 N.Y.S.2d 79 (1st Dep't 1981), *Salomone v. MacMillan Publishing Co.,* 77 A.D.2d 501, 429 N.Y.S.2d 441 (1st Dep't 1980), *Dalbec v. Gentleman's Companion, Inc.,* 828 F.2d 921, 926 (2d Cir.1987) ("New York does not permit compensatory damages to be recovered absent proof of injury to reputation or malice."), and *Richie v. Paramount Pictures Corp.,* 544 N.W.2d 21, 29–30 (Minn.1996) (holding that proof of injury

**272**

6. *Privilege.* New York affords qualified protection to defamatory "communication[s] made by one person to another upon a subject in which both have an interest." *Stillman v. Ford,* 22 N.Y.2d 48, 53, 238 N.E.2d 304, 306, 290 N.Y.S.2d 893, 897 (1968) (citation omitted). Communications by supervisors or co-workers made in connection with the evaluation of an employee's performance, including allegations of employee misconduct and communications regarding the reasons for an employee's discharge, fall within the privilege. *See, e.g., McNaughton v. City of New York,* 234 A.D.2d 83, 84, 650 N.Y.S.2d 688, 689 (1st Dep't 1996); *Mock v. La-Guardia Hospital-Hip Hosp., Inc.,* 117 A.D.2d 721, 722, 498 N.Y.S.2d 446, 447 (2d Dep't 1986).

A defendant forfeits this qualified privilege by making a false, defamatory statement with "malice" of either the common-law or constitutional variety. *See Liberman,* 80 N.Y.2d at 437–38, 605 N.E.2d at 349–50, 590 N.Y.S.2d at 862–63. Common-law malice "mean[s] spite or ill will," *id.,* 80 N.Y.2d at 437, 605 N.E.2d at 349, 590 N.Y.S.2d at 862, and defeats the privilege only if it is " 'the one and only cause for the publication,' " *id.,* 80 N.Y.2d at 439, 605 N.E.2d at 350, 590 N.Y.S.2d at 863 (quoting *Stukuls v. State,* 42 N.Y.2d 272, 282, 366 N.E.2d 829, 835, 397 N.Y.S.2d 740, 746 (1977)). Constitutional or "actual" malice means publication with "knowledge that [the statement] was false or . . . reckless disregard of whether it was false or not." *Id.,* 80 N.Y.2d at 438, 605 N.E.2d at 349, 590 N.Y.S.2d at 862 (quoting *New York Times v. Sullivan,* 376 U.S. 254, 280, 84 S.Ct. 710, 726, 11 L.Ed.2d 686 (1964)) (brackets in original). "Reckless disregard" as to falsity means that the statement is " 'made with [a] high degree of awareness of [the publication's] probable falsity' " or while " 'the defendant in fact entertained serious doubts as to the truth of [the] publication.' " *Id.,* 80 N.Y.2d at 438, 605 N.E.2d at 350, 590 N.Y.S.2d at

863 (quoting, respectively, *Garrison v. Louisiana,* 379 U.S. 64, 74, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964) and *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968)) (first and third brackets in original).

a. *Common Law Malice.* The district court concluded that as a matter of law, Loksen did not forfeit his qualified privilege by acting with common-law malice. We disagree. The court's conclusion turned largely on its finding that it was not Loksen but Dlugy who initiated the complaint that led to Albert's termination. The record on appeal does support a finding that Dlugy initially reported the incident to Huh. But evidence in the record would also support a jury finding that Buono initiated the termination proceeding, and that it was Loksen who first told Buono of Albert's alleged misconduct. And Loksen concedes that he met with Buono on the morning after the incident and told her that Albert had endangered a patient and had been dishonest. A rational jury could conclude from this evidence that Loksen initiated the termination proceedings.

Material in the record on appeal would also support a finding that Loksen had a motive to defame Albert in order to prevent him from revealing the unsafe conditions at the Hospital and the fact that Loksen was performing other jobs, sometimes with the use of Hospital equipment, during working hours. Albert asserts that he had previously complained to Loksen about defective equipment and lax procedures, and that following the incident on January 30, 1995, he threatened to bring his complaints to Hospital administrators or city officials. Other Hospital employees also testified at their depositions that they had complained to Loksen about defective equipment in the radiology department. Loksen concedes, moreover, that he was using Hospital equipment to perform a second job and had not disclosed that to

to reputation is required *under New York law*), *with Matherson v. Marchello,* 100 A.D.2d 233, 238, 473 N.Y.S.2d 998 (2d Dep't 1984) (holding that special damages are not a prerequisite to defamation suit but purporting to disapprove of *France* and *Salomone,* which held

that proof of injury to reputation, not special damages, is such a prerequisite). The issue was not raised in the district court and was therefore not addressed by the district court; nor was it argued to us. We thus do not address it here.

the Hospital. Norris, the Hospital's director of labor relations, testified that if an employee was working elsewhere during working hours, she would consider it a "theft of time."

■ In sum, Albert has adduced enough evidence to create a genuine issue of material fact as to whether Loksen initiated the proceeding that led to · Albert's termination solely because, by making false and defamatory statements to Buono, he wished to prevent Albert from reporting his own misconduct. Such evidence, if believed by a jury, could support a finding that Loksen acted with common-law malice. This conclusion could be bolstered by evidence, discussed below, that Loksen may have known or strongly suspected that some of his statements were false. *See Pecue v. West,* 233 N.Y. 316, 323, 135 N.E. 515, 517 (1922) (common-law malice inferred from defendant's making of "a false charge, not caring whether it was true or false"). Because there is a triable issue of fact as to whether Loksen's false and defamatory statements were made with common-law malice, the privilege covering each of those statements would be lost upon proof of such malice at trial.

■ *b. "Actual Malice."* Albert also raised a triable issue as to "actual malice" which, under New York law, also defeats a claim of privilege, with respect to some of the alleged statements at issue. As noted, a defendant acts with "actual malice" by making false statements with knowledge of their falsity, *Liberman,* 80 N.Y.2d at 438, 605 N.E.2d at 349, 590 N.Y.S.2d at 862, or " 'with [a] high degree of awareness of [the publication's] probable falsity' " or while " 'the defendant in fact entertained serious doubts as to the truth of [the] publication.' " *Id.,* 80 N.Y.2d at 438, 605 N.E.2d at 350, 590 N.Y.S.2d at 863 (quoting, respectively, *Garrison v. Louisiana,* 379 U.S. 64, 74, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964) and *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968)) (first and third brackets in original). Unlike situa-

tions in which the "actual malice" standard is constitutionally imposed and must therefore be proved by "clear and convincing" evidence, *see, e.g., Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 342, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), to defeat qualified privilege in New York, the plaintiff need only establish "actual malice" by a preponderance of the evidence, *see Weldy,* 985 F.2d at 65.

Loksen claimed that Albert endangered a patient's well-being and failed to follow standard procedures and the prescriptions of a physician. This claim turns on Albert's alleged failure to obtain Dlugy's written permission before loading into the applicator a source of a different strength than that Dlugy had originally requested. But there is a genuine issue of fact as to whether such conduct violated the radiology department's standard procedures. Albert claims he had standing orders to load a source of the closest actual value to the nominal value requested by the doctor and then relay the actual value to Loksen. Were a jury to accept Albert's version, then it could also conclude that Loksen—who himself had instructed Albert on the department's standard procedures—was fully aware that Albert had neither "fail[ed] to follow the order of a physician and physicist" nor neglected "established radiation safety procedures," as claimed in the Termination Report.

Similarly, Albert asserts that it was Loksen's duty, not Albert's, to inform the radiation oncologist of the actual value of the source loaded into the applicator and to calculate the appropriate exposure time. Were a jury to credit this claim, it could conclude that Loksen knew that Albert's failure to inform Dlugy immediately of the actual value of the replacement sources was consistent with standard practice and posed no additional danger to the patient. Thus, Loksen would lose qualified privilege protection with respect to those statements if Albert were to establish by a preponderance of the evidence that they were made by Loksen with knowledge of their falsity or while he in fact entertained serious doubts as to their truth.

There is insufficient evidence as to "actual malice" with respect to the other allegedly defamatory statements to give rise to a triable issue of fact. Loksen admits having accused Albert of being "dishonest," although the record on appeal is sparse on the substance of Loksen's statements on this issue. At a minimum, Loksen told Buono that Albert was dishonest in claiming he had told Dlugy shortly after he dropped the original sources that he had inserted a replacement source. While Fridman's testimony provides some corroboration for Albert's version of this aspect of the story, there is nothing in the record on appeal to indicate that Loksen knew or was "subjectively aware" of any such statement's falsity.

Loksen also appears to have accused Albert of endangering co-workers. There is no evidence in the record on appeal from which a jury reasonably could find that Loksen knew that accusation to be false or entertained serious doubts as to its truth.

There are thus triable issues of material fact as to common-law and "actual" malice that would permit a rational jury to conclude that Loksen lost protection of the privilege that covers the statements at issue. A triable issue of fact therefore exists as to every element of Albert's slander claim against Loksen. Summary judgment should not have been awarded to Loksen on that claim.

## IV. Tortious Interference with Contractual Relations

■ Albert argues that Buono and Loksen tortiously interfered with his employment relationship with the Hospital by procuring his discharge.

Under New York law, the elements of a tortious interference claim are: (a) that a valid contract exists; (b) that a "third party" had knowledge of the contract; (c) that the third party intentionally and improperly procured the breach of the

contract; and (d) that the breach resulted in damage to the plaintiff.

*Finley v. Giacobbe,* 79 F.3d 1285, 1294 (2d Cir.1996).

■ We have already found that Albert, as an at-will employee, did not have an employment contract with the Hospital. New York has adamantly refused to allow employees "to evade the employment at-will rule and relationship by recasting [a] cause of action in the garb of tortious interference with ... employment." *Ingle v. Glamore Motor Sales, Inc.,* 73 N.Y.2d 183, 189, 535 N.E.2d 1311, 1313, 538 N.Y.S.2d 771, 774 (1989). An at-will employee may maintain a tortious interference claim, however, in "certain limited situations." *Finley,* 79 F.3d at 1295; *see also Mansour v. Abrams,* 120 A.D.2d 933, 934, 502 N.Y.S.2d 877, 878 (4th Dep't 1986). To do so, he or she must establish that a "third party used wrongful means to effect the termination such as fraud, misrepresentation, or threats, that the means used violated a duty owed by the defendant to the plaintiff, or that the defendant acted with malice." *Cohen v. Davis,* 926 F.Supp. 399, 403 (S.D.N.Y.1996) (citing New York cases).

■ The requirement that the defendant be a third party to the terminated employment relationship determines the outcome of the claim against the Hospital. "[T]he tort of interference with an employment contract cannot lie against the Hospital [because it is] a party to the alleged employment contract." [14] *Kosson v. Algaze,* 203 A.D.2d 112, 113, 610 N.Y.S.2d 227, 228–29 (1st Dep't 1994) (citing *Koret, Inc. v. Christian Dior, S.A.,* 161 A.D.2d 156, 157, 554 N.Y.S.2d 867, 869 (1st Dep't 1990)); *see also Finley,* 79 F.3d at 1295 (third-party requirement applies in employment context) (citing *Mansour,* 120 A.D.2d at 934, 502 N.Y.S.2d at 878; Re-

---

14. Albert argued below that the Hospital was vicariously liable for the alleged tortious interference by Buono and Loksen. The district court rejected that claim. Albert does not contest that ruling on this appeal.

statement (Second) of Torts, § 766 cmt. g (1979)).

■ Both Buono and Loksen were employees of the Hospital and thus would not normally be considered third parties with respect to Albert's relationship with the Hospital. But a plaintiff may maintain an action for tortious interference against a co-employee by showing that the co-employee "acted outside the scope of [his or her] authority." *Kosson*, 203 A.D.2d at 113, 610 N.Y.S.2d at 228 (citing *Kartiganer Assocs., P.C. v. Town of New Windsor*, 108 A.D.2d 898, 899, 485 N.Y.S.2d 782, 783–84 (2d Dep't 1985)); *Finley*, 79 F.3d at 1295 ("[T]o show that a defendant-employee is a 'third party,' a plaintiff must show that the defendant-employee has exceeded the bounds of his or her authority").

There is also some indication that an action for tortious interference under New York law may lie against a co-employee who committed an independent tortious act against the plaintiff. *See, e.g., Nu–Life Const. Corp. v. Bd. of Educ.*, 204 A.D.2d 106, 107, 611 N.Y.S.2d 529, 530–31 (1st Dep't 1994) (granting summary judgment to co-employee accused of inducing employer to breach contract with plaintiff, an independent contractor, where plaintiff "failed to produce evidence ... to prove that [the defendant employee] was at any time acting other than as an agent of the Board *or* to show that [the defendant employee] committed any independent tort.") (emphasis added); *Miller v. Richman*, 184 A.D.2d 191, 194, 592 N.Y.S.2d 201, 203 (4th Dep't 1992) (noting that "[t]he complaint fail[ed] to allege that [the defendant] was acting outside the scope of her employment ... *or* that [the defendant] procured her discharge through fraudulent misrepresentation, threats or the violation of a duty owed to plaintiff by virtue of a confidential relationship") (emphasis added) (citations omitted); *Waldron v. Lutheran Social Services of Upper New York, Inc.*, 207 A.D.2d 1027, 1028, 617 N.Y.S.2d 665, 665 (4th Dep't 1994) (tortious interference claim fails "because plaintiff, an at-will employee, offered no proof that defendants made any fraudulent misrepresentations or threats or violated any duty owed to plaintiff based on a confidential relationship") (citing *Miller*); *Cohen*, 926 F.Supp. at 404 ("supervisor is considered to have acted outside the scope of his employment if ... the supervisor's manner of interference involved independent ·tortious acts such as fraud or misrepresentations, *or* [if] ... he acted purely from malice or self-interest") (emphasis added). Such a rule is consistent with general agency principles as interpreted in New York. *See BIB Const. Co. v. City of Poughkeepsie*, 204 A.D.2d 947, 948, 612 N.Y.S.2d 283, 285 (3d Dep't 1994) (an agent "cannot be held liable for inducing [its] principal ... to breach its contract with plaintiff .... except[ ] ... when an agent does not act in good faith and commits independent torts or predatory acts directed at another for personal pecuniary gain"). It is also consistent with the rule that a corporate officer can be held liable for interfering with an employee's relationship with the corporation if he or she commits independent torts in the process. *See, e.g., Bonanni v. Straight Arrow Publishers, Inc.*, 133 A.D.2d 585, 586, 520 N.Y.S.2d 7, 8 (1st Dep't 1987); *Buckley v. 112 Central Park South, Inc.*, 285 A.D.2d 331, 333–35, 136 N.Y.S.2d 233, 235–36 (1st Dep't 1954).

■ The district court concluded that neither Buono nor Loksen acted outside the scope of their authority as employees of the Hospital and thus were not "third parties" who could be held liable for tortious interference with the at-will employment arrangement between Albert and the Hospital. As to Buono, this conclusion was clearly correct. There is no evidence that Buono did anything more than compile a report on Albert's conduct based on information from Loksen and Dlugy. Albert points to nothing in the record to indicate that Buono was independently responsible for any misrepresentations or that she acted with malice of any kind.

Albert has thus failed to produce evidence either that Buono was a third party for purposes of a tortious interference claim, *Kosson*, 203 A.D.2d at 113, 610 N.Y.S.2d at 228–29, or that she used "wrongful means" or acted with malice in effecting the termination of Albert's employment. *Cohen*, 926 F.Supp. at 403.

▌ We disagree, however, with the district court as to the tortious interference claim against Loksen. There is a genuine issue of fact as to whether Loksen acted with common-law or "actual" malice in making false and defamatory statements about Albert, and specifically whether Loksen was motivated by a desire to undermine Albert's threats to report safety violations and other misconduct. The same factual dispute precludes summary judgment on the question of whether Loksen was a third-party to Albert's employment relationship such that he may be held liable for tortious interference. Under Albert's version of events, Loksen acted purely out of self-interest and undermined the Hospital's interests by defaming Albert in order to prevent him from reporting safety and disciplinary violations. Such third-party interference with an at-will employee's employment status is actionable under New York law.

## CONCLUSION

For the foregoing reasons, the judgment of the district court as to defendants Brooklyn Hospital and Karen Buono is affirmed; the judgment as to defendant Loksen is reversed and remanded for further proceedings consistent with this opinion.