Willie E. DUNSON, Plaintiff,

v.

TRI–MAINTENANCE & CONTRACTORS, INC., St. John's University, Kurt B. Stankus, Louis Stephens and L.F. Stephens, Inc., Defendants.

No. 98–CV–0002(NGG)(JMA).

United States District Court, E.D. New York.

Nov. 1, 2001.

---

Joel Field, White Plains, NY, for Willie E. Dunson.

Peter J. Pizzi, Connell, Foley & Geiser, Roseland, NJ, for Defendants.

## MEMORANDUM & ORDER

GARAUFIS, District Judge.

The instant action involves claims of employment discrimination on the basis of age, brought pursuant to the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C.A. § 621 *et seq.*, the New York State Human Rights Law ("Executive Law"), N.Y. Exec. Law § 296 (McKinney 2001) and the New York City Human Rights Law ("Administrative Code"), N.Y. City Admin. Code § 8–107, as well as a common law claims of libel, and a claim for unpaid vacation benefits under N.Y. Labor Law § 198 (McKinney

1986). Defendants, Tri–Maintenance Inc., Kurt Stankus, Louis Stephens and L.F. Stephens Inc. (collectively "Defendants") move for summary judgment on all claims. For the reasons discussed below, Defendants' motion for summary judgment is denied as to claims one, two, three and four, and is granted as to claim five.

## I. FACTS

When considering a motion for summary judgment, this court does not engage in finding of facts or weighing of credibility, but determines if any material questions of fact are in dispute after resolving all ambiguities and drawing all justifiable inferences in favor of the nonmoving party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Carlton v. Mystic Transportation Inc.*, 202 F.3d 129, 133 (2d Cir.2000). Accordingly, the following discussion of facts is based upon the allegations and supporting evidence submitted by the parties, affording appropriate weight to those of Dunson, the nonmoving party.

For over thirty-five years, Willie E. Dunson ("Dunson") worked for MacClean Service Company in various capacities, including night supervisor and night operations manager at St. John's Queens campus. (Pl.'s Statement Pursuant to Local Rule 56.1 "Pl.'s 56.1 Statement" at 2.) On February 28, 1996, Defendant Tri–Maintenance Inc. ("Tri–Maintenance") entered into a contract with St. John's University to take over the provision of maintenance services on campus. Pursuant to this contract, Tri–Maintenance agreed to retain employees, including Dunson, who had been employed by MacClean. (Statement of Undisputed Material Facts on Behalf of Defs. ("Defs.' Statement of Facts") ¶ 3;

Pl.'s 56.1 Statement at 3.) From March 1, 1996 until April 11, 1997, when Dunson received a termination letter dated April 10, 1997, Dunson was employed by Tri–Maintenance. (Pl.'s 56.1 Statement at 2.) Dunson turned 62 years old just after he began his employment with Tri–Maintenance and was 63 years old when he was fired. (Pl.'s 56.1 Statement at 8.)

As the night operations manager with MacClean, Dunson had been responsible for overseeing maintenance work at the St. John's Queens campus. (*Id.* at 5.) When Tri–Maintenance took over the contract, Dunson initially retained his position as the sole night operations manager of the Queens campus until some time between June and July of 1996. At that time, Tri–Maintenance hired Robert Williams, who was significantly younger than Dunson, to serve as co-manager with Dunson. (Defs.' Statement of Facts ¶¶ 4–5; Pl.'s 56.1 Statement at 6, Ex. PP.) Shortly after Mr. Williams became co-manager, Dunson was transferred to the smaller Staten Island campus and Williams continued as the sole night manager of the Queens campus. (Pl.'s 56.1 Statement at 6.) As night manager in Staten Island, Dunson maintained the same salary and title, however he was managing a significantly smaller crew of employees. Then in January 1997, Tri–Maintenance ended its service for the Staten Island campus and transferred Dunson back to the Queens campus, this time as a day foreman at the Law School. (*Id.* at 6–7.)

As Law School foreman, Dunson reported to Robert Griffenstein, the plant manager. In March 1997, two months before Dunson was fired, Griffenstein asked Dunson "what it would take for [Dunson] to retire." (*Id.* at 7.) Dunson replied that he would have to discuss it with his wife. Griffenstein then called Dunson at home during the evening, leaving a message that

Dunson should call Griffenstein at home in New Jersey "as he had to have an answer." (*Id.*) The morning after receiving this call, Dunson informed Griffenstein that it would be at least a year before he considered retiring. (*Id.*) The contents of this conversation were relayed by Griffenstein to Defendant Kurt Stankus, Tri–Maintenance's Senior Vice President of Operations. (Pl.'s Ex. L, Stankus Tr. 10, 13–14.)

On April 9, 1997, Tri–Maintenance received an anonymous letter from "The Workers at Tri–Maintenance, St. Johns's University" alleging that Dunson and his subordinate, Fabio Corrales, had engaged in various acts of misconduct and illegal activities during the previous McClean administration. (*Id.* at 8.) Immediately after receiving this anonymous letter, and within the period of time between April 9th and April 11th, a series of phone calls, meetings, interviews and investigations were conducted in response to this letter. While the parties dispute the chronology of various of these activities, it is undisputed that the following occurred at some point between April 9th and April 11th: 1) In an attempt to obtain corroboration of the accusations, Al Zweifler, the assistant manager at the Queens Campus, met with and interviewed, through a Spanish-speaking interpreter, Mrs. Zambrano, a Tri–Maintenance employee supervised by Corrales and Dunson; 2) Tri–Maintenance retained the services of L.F. Stephens, Inc., a private investigative firm to investigate the allegations; 3) Phil Caprio, CEO of Tri–Maintenance met with St. John's representatives with respect to the letter and investigation; 4) Robert C. Stewart, an investigator with L.F. Stephens, Inc., met with Tri–Maintenance management to develop a plan for investigation and interviewed another Tri–Maintenance employee, Mr. Borbor; 5) Between 10:30 p.m. on April 10th and 2:30 a.m. on April 11th, five investiga-

tive teams conducted interviews of over 20 Tri–Maintenance employees; 6) Caprio spoke with Stewart about the investigations at some point between April 10th and April 11th; 7) Caprio called Stankus on April 10th and instructed him to write a letter of termination for Dunson; 8) the letter was written on April 10th and delivered to Dunson on April 11th. (Pl.'s 56.1 Statement at 8–10, 13–15; Defs.' Statement of Facts ¶¶ 12–27.)

## II. DISCUSSION

### A. Summary Judgment

Summary judgment is only appropriate when there is no genuine issue as to any material fact, so that the moving party is entitled to a judgment as a matter of law. FED.R.CIV.P. 56(c). In determining whether a genuine issue of material fact exists, the court should review all of the evidence in the record in the light most favorable to the non-movant, and in so doing "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *Weinstock v. Columbia Univ.,* 224 F.3d 33, 41 (2d Cir.2000) (quoting *Delaware & Hudson Ry. Co. v. Consolidated Rail Corp.,* 902 F.2d 174, 177 (2d Cir.1990)). Summary judgment "is properly granted only when no rational finder of fact could find in favor of the non-moving party." *Carlton v. Mystic Transp., Inc.,* 202 F.3d 129, 134 (2d Cir.), *cert. denied,* (2000).

The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact. *See Gallo v. Prudential Residential Servs., L.P.,* 22 F.3d 1219, 1223 (2d Cir.1994). The burden then shifts to the nonmovant to "come forward with 'specific facts showing that

there is a genuine issue for trial.' " *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting FED.R.CIV.P. 56(e)). "Conclusory allegations, conjecture, and speculation, however, are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir.1998); *see also Weinstock*, 224 F.3d at 41.

Although the Second Circuit has noted that "[s]ummary judgment is appropriate even in discrimination cases," *Weinstock*, 224 F.3d at 41, it has also recently cautioned with equal force that "where intent and state of mind are in dispute, summary judgment is ordinarily inappropriate.... Thus, a trial court should exercise caution when granting summary judgment to an employer, where as here, its intent is a genuine factual issue." *Carlton*, 202 F.3d at 134 (internal citations omitted).

## B. Claims Against Defendant Tri–Maintenance: Age Discrimination Under the ADEA, New York State Executive Law and New York City Administrative Code

### 1. The Legal Standard

In Dunson's First Claim for Relief, he alleges that Tri–Maintenance acted in violation of the ADEA when it transferred, demoted and fired him on the basis of his age. (Pl.'s First Am. Compl. ¶¶ 40–45.) In addition, in his Second and Third Claims for Relief, Dunson alleges that these same acts are in violation of § 296(1) of the Executive Law and § 8–107(1)(a) of the Administrative Code. (*Id.* ¶¶ 49, 57.) As discussed below, each of these claims are subject to the same analysis.

█ ADEA claims are analyzed under the same burden-shifting paradigm used in Title VII employment discrimination cases, and as set out in *McDonnell Douglas v.*

*Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 639 (2d Cir.2000); *see also McKennon v. Nashville Banner Pub'g Co.*, 513 U.S. 352, 357, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995) ("The substantive, antidiscrimination provisions of the ADEA are modeled upon the prohibitions of Title VII."). A plaintiff alleging age discrimination "has the initial burden of 'proving by the preponderance of the evidence a prima facie case of discrimination.' " *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 134 (2d Cir.2000) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). A prima facie case under the ADEA requires the plaintiff to show that he was (1) within the protected age group, (2) qualified for the position, (3) subject to an adverse employment action, and (4) that the action occurred under circumstances giving rise to an inference of discrimination on the basis of age. *See Tarshis v. Riese Org.*, 211 F.3d 30, 35 (2d Cir.2000); *Carlton*, 202 F.3d at 134. The burden of establishing a prima facie case is minimal. The plaintiff "need not prove that age was the only or even the principal factor in the adverse employment action" and "[d]irect evidence of discrimination is not necessary ..." *Carlton*, 202 F.3d at 134.

█ Once the prima facie case is established, a rebuttable presumption of discrimination arises, and the defendant has the burden of producing evidence of a legitimate nondiscriminatory reason for the employment action. *See Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)); *Grady v. Affiliated Cent. ., Inc.*, 130 F.3d 553, 559 (2d Cir. 1997) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507, 113 S.Ct. 2742,

125 L.Ed.2d 407 (1993)). In carrying this burden, the defendant must "produc[e] evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason.... This burden is one of production, not persuasion; it can involve no credibility assessment." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (internal quotations and citations omitted). If the defendant carries this burden, the presumption then drops out of the picture, and "the plaintiff, in order to defeat summary judgment, must present evidence sufficient to allow a rational factfinder to infer that the employer was actually motivated in whole or in part by age discrimination." *Grady*, 130 F.3d at 560; *see also Reeves*, 530 U.S. at 143, 120 S.Ct. 2097.

■ Just as the *McDonnell Douglas* burden-shifting analysis and its progeny have been used to interpret the ADEA, these standards also apply to claims of age discrimination brought under the New York State Executive Law and the New York City Administrative Code. *See Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir.2001) ("Although there are differences between the State [Human Rights Law 'HRL'], the City HRL and the ... [ADEA], age discrimination suits brought under the State HRL and City HRL are subject to the same analysis as claims brought under the ADEA."); *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1180 (2d Cir.1992) (noting that "elements of proof of liability for a case commenced under [New York State Human Rights Law] have been the same as those required under the federal age discrimination in employment act"); *Gerzog v. London Fog Corp.*, 907 F.Supp. 590, 597 (E.D.N.Y.1995) (applying same prima facie standard for age discrimination claims under ADEA, New York State Executive Law and New York City Administrative Code); *see also Miller Brewing Co. v. State Div. of Human Rights*, 66 N.Y.2d 937, 939, 498 N.Y.S.2d 776, 489 N.E.2d 745 (1985). Accordingly, in deciding this motion for summary judgment with respect to Dunson's claims under the Executive Law and Administrative Code, this court applies the same standard and analysis that it applies to Plaintiff's ADEA claims.

**2. Plaintiff's Prima Facie Case**

■ Defendants do not dispute that Dunson has satisfied the first three elements of proving his prima facie case. (Br. in Support of Defs.' Tri–Maintenance Inc., Kurt Stankus, Lou Stephens and L.F. Stephens, Inc. Mot. for Summ. J. ("Defs.' Summ. J. Br.") at 13.) When Tri–Maintenance fired Dunson he was 63 years old and was an experienced managerial employee who had been working for St. Johns' University's cleaning contractors for over 35 years. On these undisputed facts, Dunson falls within the protected age group, was qualified for the position, and suffered an adverse employment action. Although Defendants concede these elements, they argue that Dunson fails to make out his prima facie case as a matter of law because he has not presented sufficient evidence to establish that his discharge occurred under circumstances giving rise to an inference of age discrimination.

Defendants contend that Dunson's sole support for his claim is a "stray" remark regarding retirement made by a Tri–Maintenance employee who had no hiring or firing power. (Defs.' Summ. J. Br. at 13–15.) But, Dunson has adequately demonstrated that in addition to this remark, other material questions of fact remain in dispute, which if proven at trial could lead a reasonable jury to find that the totality of circumstances establish Tri–Mainte-

nance's discriminatory intent. *See Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 136 (2d Cir.2000) (holding that single comment to plaintiff about retirement supported his prima facie case because, although "one stray comment" is usually insufficient to imply discrimination, it may carry greater significance when considered in context).

Griffenstein's question about retirement and his follow-up call to Dunson, at home after working hours, occurred just weeks before Dunson was fired. Dunson has also presented evidence that Griffenstein, his superior, shared this conversation with Defendant Stankus, the Vice President of Tri–Maintenance who, along with Caprio, had hiring and firing power. (Plaintiff's Mem. of Law in Opp. to Defs. Mot. for Summ. J. ("Pl.'s Opp. Mem.") at 7.) Further, there is evidence that Stankus himself made a note of Dunson's birth date in his "To be Done" calendar alongside a note to "lookup" another employee of similar age. (*Id.* at 7, Ex. QQ, Ex J. Stankus Tr. 172–73.) Additionally, there is evidence that Defendant Stewart, who was hired to investigate alleged wrongdoings by Dunson, was informed prior to, or at the start of the investigation that Tri–Maintenance was trying to offer Dunson a package "to get out." (Pl.'s Opp. Mem. at 9, Ex. H, Stewart Tr. 99.)

■ Finally, there is evidence showing that a significantly younger person, Williams, was hired to co-manage the Queens campus night shift with Dunson, and upon Dunson's transfer to the smaller Staten Island campus Williams maintained Dunson's previous position as sole night manager at Queens campus. "Generally, a plaintiff's replacement by a significantly younger person is evidence of age discrimination." *Carlton,* 202 F.3d at 135.

These facts and circumstances, as well as others that Dunson presents through specific testimony and documents, demon-strate that there are genuine and material issues of fact and intent in dispute. Given the minimal burden for establishing a prima facie case, this court cannot conclude that there is a complete "lack of evidence in support of the plaintiff's position" or that the evidence is "so overwhelmingly tilted in one direction that any contrary finding would constitute clear error." *Danzer v. Norden Systems, Inc.,* 151 F.3d 50, 54 (2d Cir.1998). Thus, viewing the facts in the light most favorable to Dunson, this court finds that Dunson has satisfied the fourth prong of the test and carried his initial burden of making out a prima facie claim of age discrimination

### 3. Tri–Maintenance's Legitimate Nondiscriminatory Reason

Tri–Maintenance has likewise carried its rebuttal burden of presenting a legitimate nondiscriminatory reason for the adverse employment action.

■ It is undisputed that Tri–Maintenance management received an anonymous letter alleging that Dunson was involved in, directly or indirectly, serious misconduct while working at St. John's University. It is also undisputed that Tri–Maintenance immediately interviewed two employees about these allegations and initiated a further investigation, which involved interviewing over twenty employees. Tri–Maintenance claims its decision to fire Dunson was based upon the results of the interviews and investigative findings. (Defs.' Summ. J. Br. at 22.) As CEO Phil Caprio testified, "[t]here was no-show employment going on, people that were not showing up for work were getting paid; and abuse. These were all, this was told to Mr. Dunson, according to who told me, and this was under his watch. And because of this he was relieved of his duties. That's it, plain and simple." (Defs.' Ex. J, Caprio Tr. at 61.18–61.24.)

■ While Defendants have carried their burden of presenting a legitimate non-discriminatory reason for the termination, this does not necessarily entitle them to summary judgment. It simply shifts the burden back to Dunson to demonstrate that there remain material issues of fact as to whether the proffered reason is pretextual. Dunson need not prove pretext on this summary judgment motion, rather he must present "evidence sufficient to allow a rational factfinder to infer that the employer was actually motivated in whole or in part by age discrimination." *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir.1997).

### 4. Pretext

■ In response to the legitimate non-discriminatory reason offered by Tri–Maintenance, Dunson argues that Tri–Maintenance had made the decision to fire him prior to learning the results of the investigation, and that "the 'investigation' was undertaken to cover up the real reason for plaintiff's termination—his refusal to consider, for at least another year, retirement." (Pl.'s Opp. Mem. at 14, 17.) If, as Dunson contends, Tri–Maintenance decided to fire plaintiff before it initiated, or knew the results of, the investigation, then a rational trier of fact could indeed conclude that the investigation was merely a pretext. This court need not decide whether that inference is correct, but only if Dunson has presented evidence adequate for submission to a jury.

Dunson has come forward with a multitude of specific facts and supporting evidence that raise material questions of fact as to the chronology of events and decisions related to Dunson's termination. Without discussing every point of dispute, this court notes several material disputed facts raised by Dunson, which could substantiate his claim that the decision to fire

him was made prior to the investigation, or made before Caprio received corroboration from the employee interviews. For instance, while Defendants allege that the very first interview with Mrs. Zambrano, held on the evening of April 9th, immediately corroborated the allegations, Dunson points to evidence that Mrs. Zambrano spoke only in Spanish and her statement was not translated to English until April 11th, after Dunson had already been terminated. (Pl.'s Opp. Mem. at 11, Ex. BB). Similarly, Plaintiff points to testimony that Stewart, an investigator with L.F. Stephens, Inc., was informed of the decision to terminate Dunson at 2:30 p.m. on April 10th, before Tri–Maintenance managers even interviewed the second corroborating witness, Borbor. (Pl.'s Opp. Mem. at 12.) Plaintiff further points to conflicting evidence as to when Caprio first received any substantive feedback from the investigators. (*Id.* at 14–17.) These facts reasonably call into question what information, if any, Defendants were relying on at the time they decided to fire Dunson.

Finally, Dunson alleges that Mrs. Zambrano's original statement indicating that Dunson was complicit in allowing Corrales to sexually harass her may have been given to Tri–Maintenance in exchange for Tri–Maintenance agreeing to hire her husband. (*Id.* at 11–12.) This allegation is not without support in the record as Dunson presents evidence that Zambrano's husband, who was present at the interview, was hired shortly thereafter and that she later gave a different statement no longer implicating Dunson in the harassment by Corrales. (Pl.'s Ex. BB, April 9th interview with Zambrano; Ex. RR, Doc. D000504 showing date of hire for Mr. Zambrano; Ex. X, Doc. D00145 record of June 16th interview with Zambrano.)

In response, Defendants vehemently contest Dunson's interpretation of this fac-

tual evidence. First, Defendants point out that Stankus testified in his deposition that he had no idea why he had made a notation of Mr. Dunson's birth date and to "lookup" another employee. (Reply Br. in Support of Defs.' Mot. for Summ. J. ("Defs.' Reply") at 8.) Defendants argue that to characterize this witnesses testimony as "unbelievable" and to draw an inference of discriminatory motive from these notations would be "to find evidence where none exists." (*Id.*) These conclusions, however, involve the very weighing of credibility and inference drawing that this court will not, and cannot, engage in on a summary judgment motion. Moreover, this court does not find that such evidence, related to Plaintiff's age, is immaterial in the context of this age discrimination case.

Defendants also emphasize that Plaintiff has gone to "great lengths to create a 'time-line' as to when Phil Caprio knew about the details of the investigation—as opposed to focusing on the substantive context that the investigation revealed." (*Id.* at 10.) Defendants contend that this effort is misplaced because it is undisputed that Caprio was in contact with the investigators and that it would be "absurd" to conclude that the "only topic discussed was the protocol." (*Id.* at 11.) The 'time-line,' however, is far from irrelevant in light of the fact that Dunson alleges that the decision to fire him was made prior to the investigation and the record demonstrates that the substance of the conversations between Caprio, Stephens and Stewart remains in dispute.

The numerous points of dispute with respect to the chronology and content of these unusual events raise material questions of fact and call for the weighing of testimony and drawing of inferences. Only a trier of fact can properly determine from the sequence of events, the surrounding circumstances, and the credibility of the witnesses' testimony, what the true motivations were when Defendants approached Dunson about retirement, when they investigated his work history and when they decided to fire him. For the purposes of summary judgment, however, Dunson has adequately presented more than conclusory allegations in support of his claim. Dunson has produced triable issues of fact with respect to his prima facie case and argument of pretext. Because there are numerous and complicated questions of fact that remain unresolved, Defendants are not entitled to judgment as a matter of law with respect to Dunson's age discrimination claim under the ADEA, the Executive Law or the Administrative Code.

## C. Individual Claims Against Stankus, Stephens and Stewart for Aiding and Abetting

### 1. Legal Standard

██ In his Second and Third Claims for Relief, Dunson further alleges that under § 296(6) of the Executive Law and § 8–107(6) of the Administrative Code, Stankus, Stephens and Stewart each are individually liable for aiding and abetting Tri–Maintenance in its discriminatory actions. Under the Executive Law it is "an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article or to attempt to do so." N.Y. Exec. Law § 296(6) (McKinney 2001). The Administrative Code uses virtually identical language, *see* N.Y. City Admin. Code § 8–107(6), and is subject to the same analysis as the Executive Law. *See McCoy v. City of New York*, 131 F.Supp.2d 363, 375 (E.D.N.Y.2001) (applying same standard to claims under § 296(6) and § 8–107(6)); *O'Gorman v. Holland*, No. 97 Civ. 0842, 2000 WL 134514, at 5 (S.D.N.Y. Feb.3, 2000) (same);

*see also Mohamed v. Marriott Int'l, Inc.,* 905 F.Supp. 141, 157 (S.D.N.Y.1995) (noting that identical wording of the Executive Law and Administrative Code evidence "clear intent" for parallel interpretation). Thus, the following discussion with respect to § 296(6) applies equally to the claim brought under § 8–107(6).

The Second Circuit has held that liability under § 296(6) is distinguishable from direct liability under § 296(1), in that a defendant need not be the employer, or hold authority to hire or fire the plaintiff, in order to be found liable for aiding and abetting pursuant to provision § 296(6). *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1317 (2d Cir.1995), *abrogated on other grounds, Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). Thus, a defendant "who actually participates in the conduct giving rise to a discrimination claim" may be personally liable under § 296(6). *Id.* Accordingly, this court has previously held, "an individual may be liable under § 296(6) for directly participating in the unlawful conduct, regardless of his status in the corporation ." *Bass v. World Wrestling Fed'n Entm't, Inc.,* 129 F.Supp.2d 491, 505 (E.D.N.Y.2001) (Garaufis, J.).

Because a claim under § 296(6) may be made against a defendant who has no control or authority over plaintiff, even a defendant that is an independent contractor for the employer may be held liable, as long as there is direct participation in the discriminatory acts. *See Cheung v. Merrill Lynch,* 913 F.Supp. 248, 253–54 (S.D.N.Y.1996) (holding that the decision in *Patrowich v. Chemical Bank,* 63 N.Y.2d 541, 483 N.Y.S.2d 659, 473 N.E.2d 11 (1984) limiting liability under § 296(1) to those with an ownership interest or decision-making power did not similarly limit liability of consultant under § 296(6)); *McIlwain v. Korbean Int'l Inv. Corp.,* 896

F.Supp. 1373, 1382 (S.D.N.Y.1995) (holding *Patrowich* does not limit liability under § 296(6) to owners and decisionmakers); *Murphy v. ERA United Realty,* 251 A.D.2d 469, 472, 674 N.Y.S.2d 415 (2d Dept.1998) (holding co-employees may be liable under § 296(6) because "employer's participation in the discriminatory practice [ ] serves as the predicate for the imposition of liability on others for aiding and abetting"). Thus, Stankus, Stephens and Stewart are each appropriately subject to liability under § 296(6).

## 2. Discussion

Defendants' argument that Stankus cannot be held liable for aiding and abetting presumes a determination by this court that Dunson has failed to prove, as a matter of law, that Tri–Maintenance violated any employment discrimination laws. (Defs.' Summ. J. Br. at 32–33.) Assuming, however, that Dunson can prove discrimination by Tri–Maintenance, Defendants make no attempt to argue that Stankus did not participate in that discrimination. (*Id.*) Moreover, it is clear from the factual record that Dunson has alleged, and provided evidence of, Stankus's direct participation and involvement in the termination of his employment. Because this court has already concluded that Dunson's discrimination claims against Tri–Maintenance survive the instant summary judgment motion, Defendants' argument that Stankus cannot be liable for aiding and abetting fails.

Defendants argue that the aiding and abetting claims against Stephens and Stewart must fail as a matter of law because these defendants were independent contractors who had no decision making power with respect to Plaintiff. (Defs.' Summ. J. Br. at 34–35.) In making this argument, Defendants rely on *McNulty v. New York Dep't Fin.,* 941 F.Supp. 452

(S.D.N.Y.1996) for the proposition that in a termination case a showing of "actual participation" for aiding and abetting also requires a showing of some decision making power. Defendants' reliance on *McNulty* is misplaced. In *McNulty*, the court addressed the issue of whether the "[actual participation] standards of the aiding and abetting cases must be read into the general theory of individual liability articulated in *Patrowich* and its progeny." *Id.* at 459.[1] In raising this question, *McNulty* was addressing a claim of direct liability, brought pursuant to § 296(1), not a claim of aiding and abetting under § 296(6). Thus, the *McNulty* court's observation that actual participation is usually linked to hiring and firing power in termination cases was directed at the standard for direct personal liability under § 296(1).[2] *McNulty*, therefore, is inapposite to the instant case, and Defendants' argument that Stephens and Stewart lack authority over Plaintiff's employment is unavailing with respect to the § 296(6) claim.

To the extent that Stephens and Stewart did actively participate in the formulation, implementation and reporting of the investigation, which Defendants do not contest, Dunson claims they aided and abetted Tri–Maintenance in developing a pretext for his termination. (Pl.'s Opp. Mem. at 8–9, 17–18, 25.) Moreover, Dunson contends that the evidence suggests Stephens and Stewart understood that the true purpose of the investigation was to find a reason to fire Dunson, and that this may have initially influenced their investigation and report. (*compare* Defs.' Ex.G, Doc. D 00372, April 11, 1997 Initial Report by L.F. Stephens, Inc., concluding: "The bottom-line is that Dunson and Corrales have terrorized the Hispanic workers for years, and sexually abused many of the female workers. They and their cohorts have stolen the University and the cleaning contractor blind." *with* Pl.'s Ex. U, Doc. D00130, June 4, 1997 report by L.F. Stephens, Inc. noting that "the investigation failed to provide sufficient evidence with respect to several allegations" and no longer implicating Dunson in theft or harassment.)

Defendants fail to carry their burden on summary judgment with respect to the claim that Stewart and Stephens aided

---

**1.** In *Patrowich v. Chemical Bank,* 63 N.Y.2d 541, 483 N.Y.S.2d 659, 473 N.E.2d 11 (1984), a case dealing with a § 296(1) claim, the New York Court of Appeals held that a defendant must have an "ownership interest or power to do more than carry out personnel decisions made by others" in order to be individually subject to suit for discrimination based on age or sex under the New York Human Rights Law. *Id.* at 542, 483 N.Y.S.2d 659, 473 N.E.2d 11. As the *McNulty* court noted, however, "*Patrowich* has been narrowed to limit only individual liability under § 296(1)(a) of the HRL ... and not to establish ownership or power over personnel decisions as preconditions to all claims of individual liability." *McNulty*, 941 F.Supp. at 459, n. 3; *see also Tomka v. Seiler Corp.,* 66 F.3d 1295, 1317 (2d Cir.1995) (noting and adopting rationale of several lower courts that "distinguished *Patrowich* by holding that a defendant who actually participates in the conduct giving rise to

a discrimination claim may be held personally liable" under § 296(6)); *Murphy v. ERA United Realty,* 251 A.D.2d 469, 674 N.Y.S.2d 415, (2d Dept.1998) ("This Court concludes ... that *Patrowich* does not limit liability under HRL § 296(6) to those 'individuals' who are owners or decisionmakers in the business that employs the plaintiff.").

**2.** Defendants also cite *Leykis v. NYP Holdings, Inc.,* 899 F.Supp. 986 (E.D.N.Y.1995) in support of their argument. Again, this is a case dealing with a § 296(1) claim, not a § 296(6) claim. The *Leykis* court itself noted, "[u]nfortunately for plaintiffs, since they did not plead a violation of section 296(6) in their complaint, this Court cannot now base [defendant's] individual liability on this tardy allegation [of aiding and abetting]." *Id.* at 994, n. 5.

Tri–Maintenance in creating a pretext for Dunson's termination. Moreover, § 296(6) does not require as a matter of law that Stephens or Stewart had authority with respect to Dunson's employment, and Plaintiff has sufficiently alleged an issue of material fact as to their involvement in aiding and abetting his termination. Therefore, this court will not dismiss Dunson's claims under Executive Law § 296(6) and Administrative Code § 8–107(6) with respect to Stephens and Stewart, nor, as discussed above, with respect to Stankus.

### D. Claim for Unpaid Vacation Benefits

In his Fourth Claim for Relief, Dunson asserts that Tri–Maintenance, in violation of Section 198 of the Labor Law, failed to pay him for his accrued vacation benefits which he earned prior to his termination. (Pl.'s First Am. Compl. ¶¶ 62–69.) Defendants offer no statement of undisputed facts or argument of law with respect to this claim in their moving papers or in their Reply Brief. (Defs.' Summ. J. Br. 1–43 and Defs.' Reply Br. 1–21.) Therefore, Defendants are not entitled to summary judgment with respect to Dunson's Fourth Claim for Relief.

### E. Common Law Claim of Libel

Dunson's Fifth and final Claim for Relief alleges that Stewart, Stephens and L.F. Stephens Inc., are liable for maliciously, and with reckless disregard for the truth, writing and publishing defamatory statements about Dunson. (Pl.'s First. Am. Compl. ¶¶ 70–75.) Because Dunson alleges that the defamatory statements were in writing, he raises a claim of libel. *See Albert v. Loksen,* 239 F.3d 256, 265 (2d Cir.2001) (stating rule that "spoken defamatory words are slander; written defamatory words are libel"). "Under New York law, a plaintiff must establish five elements to recover in libel:

1) a written defamatory statement of fact concerning the plaintiff

2) publication to a third party

3) fault . . .

4) falsity of the defamatory statement; and

5) special damages or per se actionability (defamatory on its face)."

*Celle v. Filipino Reporter Enterprises Inc.,* 209 F.3d 163, 176 (2d Cir.2000).

Defendants do not argue that Dunson would be unable to prove these elements as a matter of law, rather Defendants assert that the writings by Stephens and Stewart are immune from a libel claim because these communications fall within the "qualified privilege." Under New York law, a "conditional, or qualified, privilege extends to a 'communication made by one person to another upon a subject in which both have an interest'." *Liberman v. Gelstein,* 80 N.Y.2d 429, 437, 590 N.Y.S.2d 857, 605 N.E.2d 344 (1992) (quoting *Stillman v. Ford,* 22 N.Y.2d 48, 53, 290 N.Y.S.2d 893, 238 N.E.2d 304 (1968)); *see also Loksen,* 239 F.3d at 272; *Van–Go Transp. Co., Inc. v. New York City Bd. of Educ.,* 971 F.Supp. 90, 104 (E.D.N.Y.1997).

The qualified privilege has long been recognized as a means of protecting the free flow of information important to the public interest, especially in the employment context. *Liberman,* 80 N.Y.2d at 437, 590 N.Y.S.2d 857, 605 N.E.2d 344. "Communications by supervisors or co-workers made in connection with the evaluation of an employee's performance, including allegations of employee misconduct and communications regarding the reasons for an employee's discharge, fall within the privilege." *Loksen,* 239 F.3d at 272. The privilege is not absolute, however, and a "defendant forfeits this qualified privilege by making a false, defamatory statement with 'malice'

of either the common-law or constitutional variety." *Id.* (citing *Liberman* ). Common-law malice is based on the traditional concept of spite or ill will, while constitutional malice or "actual" malice refers to publication of false material with knowledge of its falsity, or a high degree of awareness of the falsity. *Id.* New York courts "have recognized that the constitutional as well as the common-law standard will suffice to defeat a conditional privilege." *Liberman,* 80 N.Y.2d at 438, 590 N.Y.S.2d 857, 605 N.E.2d 344. Further, to defeat the privilege, the plaintiff bears the burden of proving actual malice by a preponderance of the evidence. *Loksen,* 239 F.3d at 273.

The investigative reports of Dunson's possible misconduct on the job are the types of communications typically protected by the privilege and Dunson does not dispute Defendants' ability to invoke the privilege. Instead, Dunson argues that Stephens and Stewart abused the privilege when they made statements in their reports that they knew to be false or alternatively that they made with reckless disregard for the truth. (Pl.'s Opp. Mem. at 21, 23.) Dunson does not allege the personal animosity associated with common-law malice, thus he attempts to defeat the qualified privilege defense strictly upon a theory of "actual" malice.

Dunson's defamation claim focuses on statements written and approved by Stephens and Stewart that were reiterated, with slight variations, in several reports issued by L.F. Stephens, Inc. to Tri–Maintenance. In these reports, the investigators concluded, based on the interviews with employees, that Dunson and Corrales 1) terrorized Hispanic workers, 2) stole money and property from the university and Tri–Maintenance and 3) sexually abused female workers. (Pl.'s 56.1 Statement ¶¶ 53–56.) Dunson points to numerous employee interviews that fail to support these conclusions and to later reports by L.F. Stephens, Inc. recognizing that the investigation did not fully corroborate the original conclusions. (Pl.'s Opp. Mem. at 21–23.) Nonetheless, the fact that Stephens and Stewart may have had reason to question the accuracy of these conclusions is insufficient to defeat the privilege. As the New York Court of Appeals has held, "there is a critical difference between not knowing whether something is true and being highly aware that it is probably false." *Liberman,* 80 N.Y.2d at 438, 590 N.Y.S.2d 857, 605 N.E.2d 344. Thus, New York's highest court has found that the privilege will stand despite the fact that defendants "seemingly made these statements without actual knowledge of their truthfulness, [but where defendants] apparently presumed that the statements were not wholly false." *Foster v. Churchill,* 87 N.Y.2d 744, 752, 642 N.Y.S.2d 583, 665 N.E.2d 153 (1996). In the instant case, the record indicates that, as a matter of law, Stephens and Stewart had sufficient reason to presume the statements at issue were not wholly false. Of the approximately twenty-nine witnesses, a significant number gave statements that in some way implicated Dunson's involvement in the alleged misconduct. (Pl.'s 56.1 Statement ¶ 42(1)-(29).) While a jury presented with these facts might find that Defendants' conclusions were wrong or unfair, they could not reasonably find, as a matter of law, that Stephens and Stewart were "highly aware" that the statements were probably false. Thus, with respect to the defamation claim, Defendants are entitled to summary judgment on the basis of qualified immunity. Accordingly, Dunson's Fifth Claim for Relief against Stewart, Stephens and L.F. Stephens, Inc. is dismissed.

## III. CONCLUSION

For the foregoing reasons Defendants' motion for summary judgment on the First, Second, Third and Fourth Claims for Relief in the First Amended Complaint is DENIED, Defendants' motion for summary judgment on the Fifth Claim for Relief is GRANTED.

SO ORDERED.